# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

### COLUMBIA DIVISION

| | | |
|---|---|---|
| SUSAN J. KEESHAN, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:05-3601-MBS-BM |
| | ) | |
| v. | ) | |
| | ) | |
| EAU CLAIRE COOPERATIVE | ) | |
| HEALTH CENTERS, INC., and | ) | **REPORT AND RECOMMENDATION** |
| STUART A. HAMILTON, M.D., | ) | |
| individually and DEBORAH | ) | |
| DAVIS, M.D., individually, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter was originally filed in the South Carolina Court of Commons Pleas, Lexington County, in March 2004. At the end of the discovery period in that case Plaintiff filed a "second amended complaint" which included claims under Title VI and Title VII, following which Defendants removed this action to federal court under the provisions of 28 U.S.C. § 1446(b). Plaintiff thereafter filed a "Supplemental Complaint", which by order of the Court filed February 21, 2006 was accepted as the Plaintiff's Complaint in this case, except for the tenth and eleventh causes of action of that Supplemental Complaint, which were stricken, and also with respect to the allegations contained in the sixth, seventh, eighth and ninth causes of action asserting a claim for damages based on "distress, humiliation, sleeplessness, anxiety, inconvenience, [and] loss of employment of life", which were also stricken. See Order filed February 21, 2006. Defendants thereafter filed an answer and counterclaim on March 10, 2006.

1



The individual Defendants Hamilton and Davis filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P., on October 12, 2006. Plaintiff thereafter filed a memorandum in opposition to these Defendants' motion on October 25, 2006, following which Defendants filed a reply memorandum on November 6, 2006. The remaining corporate Defendant also filed a motion for summary judgment on November 6, 2006, and Plaintiff filed a memorandum in opposition to that motion on December 1, 2006. The Corporate Defendant filed a reply memorandum on December 11, 2006. These motions are now before the Court for disposition.[1]

**<u>Background and Evidence</u>**[2]

Plaintiff is a physician of Hispanic heritage. <u>Thomas Affidavit, Exhibit 32</u>. She was employed by the Defendant Eau Claire Cooperative Health Centers, Inc. (ECCHC), a non-profit, community based comprehensive medical center which provides access to primary health care services for traditionally under-served populations. <u>Plaintiff's Deposition</u>, p. 29; <u>Hamilton Deposition</u>, p. 140; <u>Hamilton Affidavit</u>, ¶ 2. Plaintiff was hired by the Defendant Dr. Stuart Hamilton (African-American), ECCHC's Chief Executive Officer, in 2000.

Plaintiff received a Public Health Service Scholarship from the National Health Service Corps during medical school, and as a condition of receiving this scholarship, she was obligated to work for four years following her residency at a site approved by the NHSC serving

---

[1]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), D.S.C. The Defendants have filed motions for summary judgment. As these are dispositive motions, this Report and Recommendation is entered for review by the Court.

[2]The facts and evidence are considered and discussed hereinabove in the light most favorable to the Plaintiff, the party opposing summary judgment. <u>Pittman v. Nelms</u>, 87 F.3d 116, 118 (4th Cir. 1996).



traditionally under-served populations.  Plaintiff's Deposition, p. 29.  The ECCHC qualified as such an approved site, and Plaintiff signed an employment contract which provided for a one year term which would automatically renew for successive one year terms unless the contract was terminated by either party by giving one hundred and twenty (120) days notice.  Thomas Affidavit, Exhibit 1; see also Hamilton Deposition, pp. 30-31; Hamilton Affidavit, ¶ 8.  Plaintiff worked as a staff physician in the OB/GYN Division.  Plaintiff's Deposition, pp. 39, 42-43.

At the time Plaintiff was hired, the ECCHC also employed another OB/GYN physician, Dr. Cartoulis, who served as the Lead Physician for the OB/GYN Division.  Plaintiff's Deposition, pp. 39-40, 85-86.  The lead physician of a division serves as the direct contact between that division and ECCHC's administration, and also performs various administrative duties.  Plaintiff's Deposition, pp. 43, 88-89; Hamilton Deposition, p. 14.   However, Dr. Cartoulis left a few months after Plaintiff started, and Plaintiff then became the Lead Physician for the OB/GYN Division.  Plaintiff's Deposition, pp. 40, 43, 85-86. Dr. Hamilton subsequently hired Dr. Cynthia Pridgen (African-American) to join the OB/GYN Division.  Plaintiff initially got along well with Dr. Pridgen. Plaintiff's Deposition, p. 70; Pridgen Deposition, p. 30.

Plaintiff generally received good employment evaluations from Hamilton from 2000 into 2003.  Hamilton Affidavit, ¶ 9.  Plaintiff and Hamilton did have a dispute over same-sex couple inseminations in July 2002; see Defendants' Production Responses, pp. 00063, 00065, 00069 and 00071; but this did not change Hamilton's evaluations of her.  Hamilton Affidavit, ¶ 9; Defendants' Production Responses, pp. 0050-0062.

In the early part of 2003 Hamilton was considering hiring Dr. Sheryl Clarke, a Black Jamaican National.  Plaintiff was not in favor of hiring Clarke, and publicly voiced her disapproval



when Hamilton announced his intention to offer Clarke a position during a meeting of ECCHC's administration and the OB/GYN staff.  Hamilton Deposition, pp. 14, 24; Plaintiff's Deposition, pp. 162-163.  Dr. Clarke began working for the Defendant in June 2004, and despite Plaintiff's initial opposition to her hiring, Clarke and the Plaintiff had no problems working together.  Plaintiff's Deposition, pp. 161, 173-175; Clarke Deposition, pp. 42-43. Also, in March 2003, Hamilton had offered a job to the Defendant Dr. Deborah Davis (African-American), an OB/GYN physician who had stopped practicing medicine in 2002.  Hamilton Deposition, pp. 44-45; Davis Deposition, pp. 9-11, 16-22.  Davis would only agree to take the job if she did not have to work nights or be on call.  She also did not expect to stay more than about three years.   Nevertheless, Plaintiff was agreeable to having Davis join the staff. Id; see also Plaintiff's Deposition, pp. 71-72, 74, 136.

In May 2003, Plaintiff asked for time off from work to have elective surgery.  Dr. Pridgen had also asked off for that same period of time, and Dr. Hamilton asked Plaintiff during an administrative meeting on May 26, 2003 whether she could reschedule her surgery.  Plaintiff's Deposition, pp. 95-96; Hamilton Deposition, p. 15.   Plaintiff felt like Hamilton had addressed her inappropriately during that meeting, and subsequently sent him an e-mail expressing her displeasure. Thomas Affidavit, Exhibit 2; Defendants' Production Responses, p. 00044; Plaintiff's Deposition, pp. 103-109;  Hamilton Deposition, p. 15; Hamilton Affidavit, ¶ 8. After that, the personal relationship between Plaintiff and Hamilton deteriorated.  Plaintiff's Deposition, pp. 112-114; Hamilton Deposition, pp. 15-16; Hamilton Affidavit, ¶ 8; Thomas Affidavit, Exhibit 2.

Shortly after this incident, Dr. Pridgen told Dr. Hamilton that she was considering leaving ECCHC because she could not work with the Plaintiff.  Pridgen Deposition, pp. 67-68, 71-75, 77-82.  Pridgen testified that she did not feel like Plaintiff was a team player and was hard to

4



work with. Id. Pridgen also knew about Plaintiff's e-mail to Hamilton. Pridgen Deposition, p. 80. Plaintiff and Pridgen essentially had no personal relationship after Dr. Davis came on staff. Plaintiff's Deposition, pp. 176-177.

Dr. Davis began work on June 1, 2003, while Plaintiff was out on her medical leave. Davis Deposition, p. 21; Plaintiff's Deposition, pp. 71-72, 135. The following month, Hamilton replaced Plaintiff with Davis as Lead Physician of the OB/GYN Division. Thomas Affidavit, Exhibit 3; Hamilton Affidavit, ¶ 8; Plaintiff's Deposition, pp. 149-161. This change in responsibilities had no effect on Plaintiff's pay, but Plaintiff did not like losing her administrative responsibilities, and did not like working under Davis. Plaintiff's Deposition, pp. 159-161. Plaintiff particularly objected to Davis referring to her as "Susan" or "Keeshan" instead of "Dr. Keeshan", which Plaintiff believes was disrespectful, and she further testified that they generally did not get along. Plaintiff's Deposition, pp. 74-75, 154-155. See also Thomas Affidavit, Exhibit 22. Plaintiff also did not like Dr. Davis' habit of referring to other African-Americans as "brothers" or "sister". Defendants' Exhibit 22, at p. 9.

In February 2004, Plaintiff received two written warnings from Hamilton. The first related to the after-hours call schedule shared with other outside physicians. Plaintiff testified that she was "doing the call schedule for OB/GYN", which included the month of February 2004, when another physician normally on the call schedule, Dr. Carzoli, was going to be out of the office. Plaintiff testified that she did not know what accommodation Dr. Carzoli had made to have his patients seen and "didn't want to know." Plaintiff testified that when Dr. Davis asked her who would be seeing patients in Dr. Carzoli's office while he was gone, she said she didn't know, at which time Dr. Davis instructed her to call and find out. Plaintiff testified that when she called Dr.

5



Carzoli's office, she found out that "people in his office" were going to be seeing patients who were not qualified. Plaintiff testified that she set up a meeting with a person from Dr. Carzoli's office and Dr. Davis, and "apparently some agreement was made that we would cover some of his patients....". Plaintiff testified that "the next thing I knew I had a warning letter in my file saying I had entered into an illegal contract....". Plaintiff testified that she was not responsible for any arrangement to see Dr. Carzoli's patients, and that she did not feel she had done anything wrong. Plaintiff's Deposition, pp. 75-79. Dr. Davis testified that she also does not believe Plaintiff did anything wrong, and apparently the written warning was later removed from Plaintiff's file. Davis Deposition, pp. 106-108.

The second written warning had to do with all of the OB/GYN physicians (Drs. Davis, Keeshan, Pridgen, and Clarke) authorizing their names to appear in an open letter to be published in the State Newspaper supporting the tort reform legislation pending before the South Carolina Legislature. Dr. Hamilton testified that he believed this letter could mislead and/or harm patients of ECCHC, and issued written warnings to all four OB/GYN physicians for participating in this activity. Hamilton Deposition, p. 88; Thomas Affidavit, Exhibits 8 - 11; Hamilton Affidavit, ¶ 8; Davis Deposition, pp. 88-91.

On February 16, 2004, Plaintiff submitted three written grievances concerning the two written warnings she had received, as well as concerning Davis' purported "unprofessional conduct" of referring to Plaintiff by her first name or as simply "Keeshan", rather than calling her "Dr. Keeshan". Plaintiff's Deposition, p. 196; Thomas Affidavit, Exhibits 12 - 14. Written acknowledgments of receipt of these grievances were issued February 19, 2004, advising Plaintiff of a meeting to be held the next morning relating to these grievances. Thomas Affidavit, Exhibits



15 and 16; Hamilton Affidavit, ¶ 8.  Plaintiff testified that she did not receive these written notifications prior to the scheduled meeting time, and that she was not scheduled to work on the day of the meeting.  When Plaintiff was called by Director of Human Resources Al Hanna to inquire whether she was coming to the meeting, Plaintiff advised Hanna that she was at a meeting of the Radiologic Quality Board and could not attend.  Plaintiff's Deposition, pp. 192-193.

The committee that had been formed to discuss Plaintiff's grievances proceeded to review her complaints, following which Dr. Conigliaro Jones (African-American), Medical Director for all of the physicians employed by ECCHC, issued a memorandum reminding employees about the need for professional conduct and courtesy.  Plaintiff acknowledges that Dr. Jones' actions resolved her "unprofessional" conduct grievance against Davis. Plaintiff's Deposition, pp. 189-190. However, Plaintiff testified that she was not otherwise advised of the outcome of this meeting. Documents produced during discovery indicate that Dr. Hamilton "st[ood] behind" his letter concerning the OB/GYN physicians having their names placed in the newspaper advertisement, and that with respect to the hospital coverage grievance, that grievance was denied because Plaintiff "should have notified, cleared, and coordinated arrangements with Dr. Davis, her supervisor." Thomas Affidavit, Exhibits 17, 19.

On February 22, 2004, Plaintiff wrote a memorandum concerning the "hospitalist" schedule (i.e., the coverage schedule issue), which included a copy of a letter from Plaintiff's attorney husband (also Plaintiff's counsel in this case), and the next day she delivered another memorandum requesting monetary compensation for productivity bonuses she asserted were owed to her.  Thomas Affidavit, Exhibits 20 and 21.  Also on February 23, 2004, Plaintiff filed a memorandum titled "Religious and Racial Discrimination Complaint", asserting that she had been



subjected to religious and racial discrimination and harassment by ECCHC and by her direct supervisor, Dr. Davis. Thomas Affidavit, Exhibit 22. In this document, Plaintiff demanded that Dr. Davis be terminated. Id. See also, Plaintiff's Deposition, pp. 156, 196.

Hamilton testified that while he initially took Plaintiff's grievances seriously, he ultimately concluded that Plaintiff and her attorney husband were simply laying a paper trail for an impending lawsuit. Hamilton Deposition, pp. 52-53. The matter was discussed at an ECCHC Board meeting on February 23, 2004, with the minutes of that meeting reflecting the following notation:

> We have a disaffected provider whose spouse is an attorney, and doesn't think the spouse is being treated fairly by the [Defendant]. Allegations include religious and racial harassment - "evangelical Christian overload." An attorney will probably be needed. The provider's contract ends July 5, and probably won't be renewed. The allegations are all refutable but it will take time.

Thomas Affidavit, Exhibit 23.

Plaintiff submitted a memorandum styled "response & request for grievance committee hearing" dated February 24, 2004, in which she demanded a grievance hearing as provided for in the ECCHC employee handbook. Thomas Affidavit, Exhibit 24. The next day, Plaintiff and Hamilton had a conversation about her complaints and how they could be resolved while both were attending a meeting at the Embassy Suites Hotel. Plaintiff's Deposition, pp. 205-206; Hamilton Deposition, pp. 39-40, 105. Hamilton thereafter presented Plaintiff with a memorandum the following day with proposed solutions to resolve Plaintiff's differences with ECCHC. Thomas Affidavit, Exhibit 25. Plaintiff made no commitment; Plaintiff's Deposition, pp. 208-209; see also Hamilton Deposition, pp. 103-104; Hamilton Affidavit, ¶ 8; but revisions were subsequently made to this agreement by the parties. Plaintiff's Deposition, pp. 208-210; Thomas Affidavit, Exhibits 26 and 27; Hamilton Deposition, pp. 107-108, Hamilton Affidavit, ¶ 8. Hamilton



8

signed the revised agreement on behalf of ECCHC, and presented the agreement to Plaintiff on March 5, 2004.  <u>Hamilton Deposition</u>, p. 110; <u>Thomas Affidavit, Exhibit 27</u>.  However, Plaintiff declined to sign this document.

Hamilton testified that, since Plaintiff refused to sign the memorandum of agreement, it served as her 120 day notice pursuant to the terms of her employment contract and that her contract would not be renewed after July 2004, the completion date for her four year NHSC commitment.  <u>Hamilton Deposition</u>, pp. 114, 119; <u>see</u> <u>also</u> <u>Plaintiff's Deposition</u>, p. 215.  Plaintiff's employment with ECCHC ended on July 17, 2004.

### Discussion

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Rule 56(c), Fed.R.Civ.P.  The moving party has the burden of proving that judgment on the pleadings is appropriate.  Once the moving party makes this showing, however, the opposing party must respond to the motion with "specific facts showing there is a genuine issue for trial." Rule 56(e), Fed.R.Civ.P.

### I.

### (Federal Discrimination Claims)

In her sixth and eighth causes of action, Plaintiff asserts claims for race discrimination in violation of Title VI and VII of the Civil Rights Act of 1964.  In her seventh and ninth cause of action, Plaintiff asserts claims for wrongful discharge and retaliation in violation of those statutes.  These claims are made against the corporate Defendant only .

9



In its motion for summary judgment, this Defendant asserts that Plaintiff's Title VII claims are either procedurally barred or substantively meritless. Defendant further contends that Plaintiff's Title VI claims are without merit because she cannot demonstrate that the primary objective of ECCHC's federal financial assistance is to provide employment, as required by that statute.

Title VII Claims

**Hostile Work Environment Claim**.  In her sixth cause of action, Plaintiff asserts a claim of race discrimination hostile work environment in violation of Title VII.  Plaintiff alleges that she "was subjected to daily workplace torment, bullying and discrimination by Defendant Davis, her direct supervisor, with the knowledge, complicity, and ratification by Defendant Hamilton and the ECCHC board of directors." Complaint, ¶ 54.[3]

---

[3]As part of its motion, the corporate Defendant argues that, to the extent Plaintiff is claiming that the Defendant discriminated against her by replacing her with Dr. Davis in June 2003, that that claim is time barred.  Plaintiff argues in her brief that any claims related to her being replaced by Dr. Davis and demoted are not time barred because "[i]t was not until Dr. Davis had been [Plaintiff's] supervisor for some time that she, or any reasonable person might have realized she had such a claim." Plaintiff's Brief, at p. 21.  However, the undersigned has carefully reviewed the allegations of Plaintiff's supplemental Complaint, and can find no claim relating to Plaintiff having been replaced by Dr. Davis in either of her two Title VII causes of action.

In any event, it is also readily apparent that Plaintiff was replaced by Dr. Davis as lead physician in July of 2003, more than 300 days before the filing of Plaintiff's administrative charge on May 18, 2004. In order to have exhausted this issue as a separate claim for purposes of this lawsuit, Plaintiff had to have filed an administrative charge asserting this claim within 300 days of the event. 42 U.S.C. § 2000e-5(e); see also, discussion on exhaustion and procedural bar, infra. Therefore, even if Plaintiff had asserted this particular claim in her Complaint, it would be time barred. See Amtrak v. Abner Morgan, Jr., 536 U.S. 101, 114 (2002) ["Each incident of discrimination...constitutes a separate actionable 'unlawful employment practice'," and prior discrete discriminatory acts which are not filed within the 300 day time limit "are untimely filed and no longer actionable."]; Olson v. Mobile Oil Corp., 904 F.2d 198 (4th Cir. 1990) [Administrative limitations period commences when employee is informed of their termination, even if they are not then aware of this discriminatory nature].

Finally, although Plaintiff's demotion in 2003 cannot be considered as a separate, free-



To establish a hostile work environment claim, Plaintiff must present evidence to prove the following elements: 1) she was subjected to unwelcome conduct in a work related setting; 2) the conduct complained of was based on her race (Hispanic); 3) the conduct was sufficiently severe or pervasive to alter her condition of employment and to create an abusive work environment; and  4) the conduct is imputable on some factual basis to her employer. Ocheltree v. Scollon Productions, Inc., 308 F.3d 351, 356 (4th Cir. 2002), rehearing en banc, 335 F.3d 325 (4th Cir. 2003), cert. denied, 124 S.Ct. 1406 (2004); Spicer v. Com.of Va. Dep't of Corrections, 66 F.3d 705, 710 (4th Cir. 1995); Brown v. Perry, 184 F.3d 388, 393 (4th Cir. 1999).

For purposes of summary judgment, the only argument the corporate Defendant has submitted concerns the fourth prong of the hostile work environment elements. Specifically, Defendant argues that any conduct by Davis with respect to the Plaintiff is not imputable on some factual basis to the Defendant because the Defendant took "prompt and adequate action" to stop the alleged harassment once it was notified of Plaintiff's complaint. Under the evidence submitted, the undersigned is constrained to agree.

Under the applicable caselaw, if a supervisor was not involved in the alleged harassment, the cited conduct may be imputable to the Defendant for purposes of liability only if the evidence shows that the Defendant was negligent in failing, after actual or constructive knowledge, to take prompt and adequate action to stop the harassment. Alexander v. Alcatel NA Cable Systems,

---

standing disparate treatment claim, it could be considered as part of her separate hostile work environment claim, if the facts show that it was relevant to that claim. *Cf.* Huckabay v. Moore, 142 F.3d 233, 239 (5th Cir. 1998) [distinguishing applicability of the continuing violation theory to hostile work environment claims from other types of claims]. However, for the reasons set forth herienabove, the undersigned does not find that Plaintiff's demotion in 2003 has any bearing on her hostile work environment claim.

11



Inc., 50 Fed.App x. 594, 601 (4th Cir. Oct. 15, 2002); Mikels v. City of Durham, 183 F.3d 323, 332 (4th Cir. 1999); Spicer, 66 F.3d at 710. Such a situation would arise either where the employer had actual knowledge of the harassing behavior, or where "the harassment was so pervasive that employer awareness may be inferred." Ford v. West, 222 F.3d 767, 775-776 (10th Cir. 2000) ["A plaintiff demonstrates actual employer knowledge where the plaintiff has reported harassment to management-level employees....An employer may be deemed to have constructive knowledge of racial harassment where the pervasiveness of the harassment supports an inference of employer knowledge....[T]o infer employer knowledge from only the level of pervasiveness essential to make out a hostile environment claim would be illogical because if that were the rule, knowledge would be attributed to employers in all cases of hostile work environment founded on pervasiveness."]; EEOC v. Dial Corp., 156 F.Supp. 2d 926, 952 (N.D.Ill. 2001).

If, however, the hostile environment was instead created by a supervisor with immediate or successive higher authority over the Plaintiff, the employer Defendant may be subject to vicarious liability. Faragher v. City of Boca Raton, 524 U.S. 775, 778 (1998). To escape this vicarious liability, if no tangible employment action has been taken, a defendant employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. This defense is comprised of two elements; a) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765 (1998).

Whether Davis qualifies as Plaintiff's "supervisor" as that term is defined in the applicable caselaw is unclear. Cf. Dawson v. County of Westchester, 351 F.Supp.2d 176, 188-189

12



(S.D.N.Y. 2004); <u>Reese v. Meritor Automotive, Inc.</u>, No. 199-56, 2000 WL 33422736, *10 (W.D.N.C. Feb. 4, 2000); <u>Mikels</u>, 183 F.3d at 333-334. Neither party addresses this issue in their briefs. Nevertheless, based on the evidence presented to the Court, whether Davis is deemed to be Plaintiff's "supervisor" or not, Plaintiff has failed to present a genuine issue of fact as to whether the corporate Defendant should be held liable to survive summary judgment.

First, Plaintiff's hostile work environment claim against Davis is that Davis was disrespectful towards her, did not properly refer to her by her "doctor" title, and that they generally did not get along. <u>Plaintiff's Deposition</u>, pp. 74-75, 154-155, 196; <u>Thomas Affidavit, Exhibit 22</u>.[4] These actions do not constitute a "tangible employment action" for purposes of imposing vicarious liability under a hostile work environment claim. <u>See</u> <u>Page v. Bolger</u>, 645 F.2d 227, 233 (4th Cir. 1981), <u>cert. denied</u>, 454 U.S. 892 (1981); <u>Burlington</u>, 118 S.Ct. at 2261, 2268-2269 [adverse employment action is a significant, tangible employment action, i.e., a significant change in employment status, such as discharge, demotion, or undesirable reassignment]; <u>Crady v. Liberty Nat'l Bank & Trust Co. of Ind.</u>, 993 F.2d 132, 136 (7th Cir. 1993)["A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material

---

[4]Plaintiff's claim concerning Hamilton, at least for purposes of her hostile work environment claim, is that he as well as the ECCHC Board failed to take corrective action once Davis' conduct was reported to them. Plaintiff's other claims about Hamilton giving her written warnings for employment conduct and with respect to her ultimate discharge from employment apply to her separate retaliation claim, discussed <u>infra</u>. Whether Plaintiff was subjected to a hostile work environment by the Defendant Davis is a separate and distinct cause of action from whether she was otherwise discriminated against and discharged due to unlawful retaliation against her for having engaged in protected conduct. <u>Patrick v. Chertoff</u>, No. 01-152, 2005 WL 1827876, at * 4 (N.D.Texas July 27, 2005) ["discrimination and retaliation are separate claims, and must be treated accordingly"]. <u>See</u> <u>Thomas Affidavit, Exhibits 22 and 24</u>.



responsibilities, or other indices that might be unique to a particular situation]. *Cf.* <u>Kocsis v. Multi-Care Management, Inc.</u>, 97 F.3d 876, 887 (6th Cir. 1996)[demotion without change in pay, benefits, duties or prestige insufficient]; <u>see also</u> <u>Flaherty v. Gas Research Institute</u>, 31 F.3d 451, 456 (7th Cir. 1994) [a "bruised ego" is not enough]; <u>See generally</u>, <u>Lewis v. Forest Pharmaceuticals, Inc.</u>, 217 F.Supp.2d 638, 648 (D.Md. 2002) ["Reprimands, whether oral or written, do not *per se* significantly affect the terms or conditions of employment."] (citing <u>Nye v. Roberts</u>, 159 F.Supp.2d 207, 213 (D.Md. 2001)]; <u>Naughton v. Sears, Roebuck & Co.</u>, No. 02-4761, 2003 WL 360085 at *5 n. 1 (N.D.Ill. 2003)[criticism, including a negative performance review or development plan, does not constitute an adverse employment action]. Therefore, even if Davis was Plaintiff's supervisor, the Defendant can assert the affirmative defense provided by <u>Ellerth</u>. The question to be resolved then, whether Davis was Plaintiff's supervisor or not, is whether the Defendant exercised reasonable care to prevent and correct promptly any racially harassing behavior. <u>Faragher</u>, 524 U.S. at 778 [where a supervisor is involved]; <u>Mikels</u>, 183 F.3d at 332 [non supervisor case].

Plaintiff testified that she submitted a written grievance to the Defendants on February 16, 2004 concerning Davis' purported "unprofessional conduct", together with the two other grievances in which she complained about the two written warnings she had been given by Hamilton. <u>Plaintiff's Deposition</u>, p. 196; <u>Thomas Affidavit, Exhibits 12 - 14</u>. With respect to Plaintiff's complaints against Davis, she testified that following the filing of her grievance against Davis, Dr. Jones (the Medical Director) handled the matter and came by and spoke to her about the need for professional conduct and courtesy, which Plaintiff acknowledged resolved her grievance against Davis. <u>Plaintiff's Deposition</u>, pp. 189-190. While Plaintiff subsequently, on February 23, 2004, filed another complaint with the Defendant regarding Dr. Davis, and demanding that Davis

14



be fired, she has presented no evidence to show that she was subjected to racial harassment or a hostile work environment by Davis following the issuance of Dr. Jones' memorandum, and in fact testified to just the opposite.  Plaintiff's Deposition, pp. 189-190, 236-237.  Further, the evidence clearly shows that, following Plaintiff's February 23, 2004 memorandum, Dr. Hamilton had several discussions with her concerning her complaints about working with Dr. Davis, including the possibility of assigning she and Davis to different work sites.  Plaintiff's Deposition, pp. 205-210; Hamilton Deposition, pp. 39-40, 103-105, 110; Thomas Affidavit, Exhibits 25-27; Hamilton Affidavit, ¶ 8.  While no signed agreement was ever reached, Plaintiff acknowledged that thereafter she and Davis had no problems of any substance.  Plaintiff's Deposition, pp. 236-237.

Hence, the evidence reflects that, upon receiving a complaint from Plaintiff about Davis, the Defendant took remedial steps sufficient to prevent or stop any harassing behavior, following which Plaintiff had no further or additional problems with Davis.  Under the applicable caselaw, even assuming Plaintiff had been subjected to a racially hostile work environment by the Defendant Davis prior to that time, the corporate Defendant is not subject to liability for that prior conduct. See Matvia v. Bald Head Management, Inc., 259 F.3d 261, 266 (4th Cir. 2001); Parkins v. Civil Constructors of Illinois, Inc., 163 F.3d 1027, 1032 (7th Cir. 1998) ["An employer's legal duty in co-employee harassment cases will be discharged if it takes reasonable steps to discover and rectify acts of [racial] harassment."]; Hollins v. Delta Air Lines, 238 F.3d 1255, 1257-1258 (10th Cir. 2001) [Employer not liable where management acted on complaints to stop the harassing behavior, following which conduct complained of ceased]; cf. Knabe v. Boury Corp., 114 F.3d 407, 411, n. 8 (3d Cir. 1997) ["A remedial action that effectively stops the harassment will be deemed adequate as a matter of law."]; Mikels, 183 F.3d at 329-330 [discussing importance of whether

15



remedial action taken by the employer was effective]; <u>Fleenor v. Hewitt Soap Co.</u>, 81 F.3d 48 (6th Cir.), <u>cert. denied</u>, 117 S.Ct. 170 (1996) [the test is whether the employer failed to implement prompt and corrective action]. <u>See also</u> <u>Barrett v. Applied Radiant Energy Corp.</u>, 240 F.3d 262, 266 (4th Cir. 2001)["By providing clear direction as to how to report sexual harassment and by including a confidentiality and anti-retaliation provision, [employer's] policy was reasonably calculated to prevent and promptly correct any sexually harassing behavior."].

Plaintiff's sixth cause of action asserting a Title VII hostile work environment claim should therefore be dismissed.

**Retaliation Claim**. In her seventh cause of action, Plaintiff alleges that after she asserted her complaint of discrimination in her February 23, 2004 grievance, the Defendant decided to "terminate [Plaintiff's] employment because she complained of discrimination." <u>Complaint</u>, at. ¶ 58. Plaintiff alleges that she was officially notified that she would be terminated on March 9, 2004. <u>Id</u>, ¶ 61.

Section 704(a) of Title VII, 42 U.S.C. § 2000(e)-3(a)[setting forth the standard for a retaliation claim], provides as follows:

> It shall be an unlawful practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicants for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

Retaliation cases under Title VII are subject to the same requirements of proof as are applicable to

16



disparate treatment claims. <u>Ross v. Communications Satellite Corp.</u>, 759 F.2d 355, 365 (4th Cir. 1985) <u>overruled on other grounds</u>, <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989); <u>see</u> <u>also</u> <u>Williams v. Cerberonics, Inc.</u>, 871 F.2d 452, 457 (4th Cir. 1989). "The employee is initially required to establish a prima facie case of retaliation by a preponderance of the evidence. Such a prima facie case consists of three elements: (1) the employee engaged in protected activity; (2) the employer took adverse employment action against the employee; and (3) a causal connection existed between the protected activity and the adverse action." <u>Id.</u>; <u>Munday v. Waste Management of North America, Inc.</u>, 126 F.3d 239, 242 (4th Cir. 1997). Once a prima facie case has been presented, the Defendant employer has the burden of producing a legitimate, non-discriminatory reason for its actions. If the employer can produce a legitimate, non-discriminatory reason for its actions, the employee must then demonstrate that the Defendant's proffered reason is pretextural. <u>Id.</u>

In its motion for summary judgment, the corporate Defendant does not argue the merits of Plaintiff's retaliation claim. Rather, the Defendant argues that this claim is subject to dismissal because Plaintiff failed to exhaust her administrative remedies with respect to this claim prior to filing this lawsuit. Defendant is correct that, in order to bring a lawsuit in United States District Court under Title VII, a plaintiff is first required to properly exhaust his or her administrative remedies. Specifically, Title VII requires that a claimant file a charge of discrimination with the EEOC within one hundred and eighty (180) days of the alleged discriminatory act or acts, or, if the alleged discrimination occurred in a "deferral state", within three hundred (300) days from the alleged discriminatory act or acts if the claimant initially institutes proceedings with the appropriate state agency, or within thirty (30) days of the state agency's termination of its proceedings, whichever is earlier. <u>See</u> 42 U.S.C. § 2000e-5(e).

17



It is undisputed that South Carolina is a deferral state, and that SCHAC is the appropriate state agency for purposes of initiating state proceedings.   Plaintiff filed her administrative charge of discrimination with SCHAC on May 18, 2004. Thomas Affidavit, Exhibit 32.  Although Plaintiff was still working for the Defendant at that time, she had received written notice from the Defendant on March 9, 2004 that her employment contract was not going to be renewed and that she would no longer be employed with the Defendant as of July 2004.  Plaintiff's Deposition, p. 218; see Supplemental Complaint, ¶ 61.   In her charge of discrimination with SCHAC, filed over two (2) months after she had received this notice that she would be terminated, Plaintiff alleges that after she filed her grievances with the Defendant alleging race discrimination, the Defendant attempted to reassign her to a "remote site", that she was told that if she wanted to continue with her employment she must withdraw her grievances, and that "[a]lthough these adverse conditions meet the criteria for constructive discharge, there are negative consequences for me if I resign. If I leave my employment with [the Defendant], I will be in default of my contract with HRSA to work four years in a medically under-served area."

Defendant argues that, since Plaintiff had received written notice on March 9, 2004 that her contract was not going to be renewed, if Plaintiff deemed that to be a retaliatory act for her having engaged in protected conduct, she had three hundred (300) days from that date to assert that charge with the EEOC (through SCHAC) with an administrative filing, and that a failure by her to do so bars her from pursuing a Title VII lawsuit on that claim in this Court.   United Black Firefighters of Norfolk v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979); Mickel v. South Carolina State Employment Serv., 377 F.2d 239, 242 (4th Cir. 1967).  A plain reading of Plaintiff's administrative charge shows that she did not specifically make this claim. Nevertheless, Plaintiff asserts in her brief

18



that she complained in writing to the EEOC that she was being "forced out" in her general intake questionnaire on March 4, 2003; see Plaintiff's Production Responses, pp. 000094-000098; that her formal charge reflected that she could only remain employed by the Defendant if she were to withdraw her grievances, and that her claim of retaliatory discharge was therefore "placed...before" the administrative agency for review. After careful review of the filings and arguments of the parties, the undersigned agrees with the Plaintiff that sufficient evidence has been presented that this claim has been exhausted to avoid summary judgment.

A claim not specifically asserted in an administrative filing is nevertheless still considered to have been exhausted where the agency would necessarily have considered the claim as part of its investigation of the claimant's administrative charge.[5] See Smith v. First Union Nat'l Bank, 202 F.3d 234, 248 (4th Cir. 2000); Tran v. Standard Motor Products, Inc., 10 F.Supp.2d 1199, 1208 (D.Kan. 1998) [even where claimant fails to assert a claim in their administrative charge, if that claim was nevertheless considered by the administrative agency as part of the administrative investigation of the claimant's administrative filing, then the claim is properly exhausted]; Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 963 (4th Cir. 1996) ["Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit"]; but see LaPorta v. City of Chicago, No. 95-2899, 1999 WL 965970 at * 3 (N.D.Ill. 1999). Plaintiff's EEOC charge certainly raises the claim that, as a result of her having engaged in protected conduct, she was being retaliated against with regard to the issue or question

---

[5]The actual findings of the administrative agency nor any other evidence concerning the scope of the investigation have been presented to the Court for review.



of her continued employment with the Defendant.

Ultimately, of course, Plaintiff's contract was not renewed and her employment was terminated in July 2004. Plaintiff's administrative charge was sent to SCHAC for investigation that same month, and her right to sue letter was not issued until October 4, 2005, well after her termination. <u>Complaint</u>, ¶ 52. Hence, the allegations in Plaintiff's supplemental Complaint with respect to her discharge are reasonably related to her SCHAC charge and would be expected to have been part of a reasonable administrative investigation of her charge. *Cf.* <u>Smith v. First Union National Bank</u>, 202 F.3d 234, 247-248 (4th Cir. 2000) ["If a plaintiff's claims in her judicial complaint are reasonably related to her [administrative] charge and can be expected to follow from a reasonable administrative investigation, the plaintiff may advance such claims in her subsequent civil suit"].

Therefore, the Defendant is not entitled to summary judgment on Plaintiff's retaliatory discharge claim on the ground asserted.

### Title VI Claims

In her eighth and ninth causes of action, Plaintiff reasserts the hostile work environment and retaliation claims set forth in her sixth and seventh causes of action. In her eighth and ninth causes of action, however, Plaintiff asserts these claims under Title VI of the Civil Rights Act of 1964, instead of Title VII. Title VI, in relevant part, provides that

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

The corporate Defendant correctly asserts that Plaintiff's claims under Title VI are



subject to dismissal. First, since Plaintiff's Title VI hostile work environment claim is based on the same facts as her Title VII claim, which the undersigned has already found is subject to dismissal on the merits, that claim would be subject to dismissal in any event. See Guardians Assoc. v. Civil Serv. Comm. of City of N.Y., 463 U.S. 582, 634 (1983) (Marshall, J. dissenting) [Claims under Title VI and Title VII utilize the same proof elements]; Jane v. Bowman Gray Sch. of Med.-N.C. Baptist Hosp., 211 F.Supp.2d 678, 690 (M.D.N.C. 2002) [concluding that Title VI claims are appropriately analyzed under the same standards as would be applied to Title VII claims].

Additionally, it is clear that Title VI does not provide redress for employment discrimination claims unless the employer receives federal financial assistance with the primary objective of that federal financial assistance being to provide employment. 42 U.S.C. § 2000d-3; Trageser v. Libbie Rehabilitation Center, Inc., 590 F.2d 87, 89 (4th Cir. 1978) ["Title VI does not provide a judicial remedy for employment discrimination by institutions receiving federal funds unless...providing employment is a primary objective of the federal aid...."]; see also Allen v. College of William & Mary, 245 F.Supp.2d 777, 785 (E.D.Va. 2003) ["Congress never intended that [Title VI] be applicable to race discrimination in the employment context"]; Johnson v. Transportation Agency, Santa Clara County, Cal., 480 U.S. 616, 627, n. 6 (1987) [noting that Title VI was not intended to subsume Title VII by making any employer who receives federal financial assistance liable under Title VI].

The Defendant is a non-profit, community based comprehensive medical center. Hamilton Affidavit, ¶ 2. Although it does receive some federal funding through grants, its primary objective is to provide healthcare services for traditionally under-served populations, with any federal grant money received going to achieve this purpose. Hamilton Affidavit, ¶¶ 3, 5 and



<u>Attachments A & B</u>. There is no evidence that ECCHC receives any federal funding the purpose of which is to provide employment to physicians. <u>Hamilton Affidavit</u>, ¶¶ 6-7.

Plaintiff argues that Title VI applies to her claims because the Defendant receives federal funding to deliver healthcare, and that this is accomplished by the hiring and employing of doctors and nurses. However, even assuming that the federal grant funds received by the Defendant go into ECCHC's general fund, resulting in at least some of this grant money being used to pay salaries, that would not meet the criteria of being the "primary objective of the federal aid". <u>Trageser</u>, 590 F.2d at 89; <u>see also</u> 42 U.S.C. § 2000d-3 [in order to fall under Title VI, the "primary objective of the Federal financial assistance [must be] to provide employment"]. The *primary* objective of any such grant money is to provide healthcare to under-served populations, and Plaintiff has provided no evidence to show that the purpose of any federal funding received by the Defendant is to provide employment. <u>Causey v. Balog</u>, 162 F.3d 795, 802 (4th Cir. 1998)[conclusory statements, without specific evidentiary support, do not support a claim for discrimination]; <u>Evans v. Technologies Applications & Serv. Co.</u>, 80 F.3d 954, 960 (4th Cir. 1996) ["unsubstantiated allegations" are insufficient to defeat summary judgment]. Therefore, the Defendant is entitled to summary judgment on Plaintiff's Title VI claims.

## II.

### (State Law Claims)

Plaintiff also asserts several state law causes of action in her supplemental Complaint, as follows: violation of the South Carolina Payment of Wages Act (first cause of action); wrongful discharge and retaliation in violation of the South Carolina Payment of Wages Act (second cause of action); breach of contract accompanied by a fraudulent act (third cause of action); retaliation in

22



violation of South Carolina Code Ann. § 16-17-560 - intimidation on account of political opinions or exercise of civil rights (fourth cause of action); and wrongful discharge and retaliation for refusing to aid and abet the unlicensed practice of medicine and for refusing to aid and abet possible insurance fraud (fifth cause of action).  These claims are all asserted against the corporate Defendant, as well as the individual Defendants Davis and Hamilton.[6]

     **Wage Payment Act Claim**. In her first cause of action, Plaintiff asserts a violation of the South Carolina Payment of Wages Act.  <u>See</u> S.C.Code Ann. § 41-10-10, <u>et</u>. <u>seq.</u>.  This Act creates a cause of action against an employer by an employee for failure of the employer to pay wages as required under that Act.  S.C.Code Ann. § 41-10-80(C).

     Plaintiff alleges that ¶ 2.01 of her contract with the Defendant ECCHC provided that if her base salary was less than 40% of her net production (collected fees), she was entitled to receive a settlement in an amount equal to the difference between her base salary and such sum, payable upon completion of six month service and at six month intervals thereafter. <u>Thomas Affidavit, Exhibit 1</u>.  Plaintiff alleges that she failed to receive this compensation, even though she tendered a written demand for these payments on February 23, 2004.[7]

---

[6]Defendants argue that Plaintiff has asserted her first and second causes of action against the individual Defendants only.  However, Plaintiff's supplemental Complaint reflects that her first and second causes of action are against "the Defendants", which Plaintiff argues in her brief includes both the remaining natural Defendants (Hamilton and Davis) as well as the corporate Defendant. While Defendants argued in their initial brief supporting summary judgment that Plaintiff has asserted these claims only against the natural Defendants Hamilton and Davis, they fail to provide a cite for this assertion, and have further failed to respond in their reply brief to Plaintiff's assertion that these claims are also being made against the corporate Defendant.

[7]In her second cause of action, Plaintiff alleges that she was terminated out of retaliation because she would not waive and withdraw her claim for payment of these wages. <u>See</u> discussion, <u>infra</u>.



Individual agents or officers of an employer may be personally liable for unpaid wages to an employee under this Act only if such agents or officers knowingly permit the employer (here, ECCHC) to violate the statutory duty to pay wages to employees when due.  Dumas v. InfoSafe Corp., 463 S.E.2d 641, 645 (S.C.Ct.App. 1995).  Hamilton and Davis argue in their motion for summary judgment that they are entitled to dismissal of Plaintiff's Wage Payment Act claims because Plaintiff has failed to submit evidence sufficient to show that ECCHC violated this Act at all, much less that either one of them knowingly permitted the corporate Defendant to do so. Defendants argue that Plaintiff has only *alleged* in her Complaint that she never received a bonus payment (which is undisputed), but that she does not set forth any facts to show (or even specifically allege) that her net production actually ever exceeded 40% of her base salary, which was what was required before she could receive any such bonus payment.  Defendants further argue that they have submitted evidence to affirmatively show that Plaintiff's net production never exceeded 40% of her base salary, and that she was therefore never entitled to any bonus payment.

Sonja McCausland, the corporate Defendant's Chief Financial Officer, attests in an affidavit that she has personally reviewed the employment records of the corporate Defendant and that Plaintiff is not entitled to any additional compensation under her employment contract. Attached to McCausland's affidavit are copies of employment records and responses to interrogatories previously provided to the Plaintiff to support McCausland's findings.  Defendants argue that, in response, Plaintiff has failed to provide any evidence to refute or dispute Defendants' calculations, or to create a genuine issue of fact with respect to this claim.

For her part, Plaintiff argues that during the course of the litigation the Defendants have provided different calculations concerning her net production, specifically referencing

24



Defendants' own Exhibit B to McCausland's affidavit, which reflects net production figures well in excess of an amount necessary for Plaintiff to have received a production bonus. See also Defendants' Production Response at ECCHC 314-318. At her deposition, McCausland was unable to explain this discrepancy; see McCausland Deposition, pp. 22-27; and the undersigned finds that this evidence presents a sufficient issue of fact for the Plaintiff to avoid summary judgment on her Wage Act claim against the corporate Defendant. However, the undersigned is constrained to agree with the Defendants that Hamilton and Davis, individually, are entitled to summary judgment on Plaintiff's Wage Act claims. Plaintiff has presented no evidence to show that either Davis or Hamilton were involved with, or had any responsibility for, calculating any productivity bonus for the Plaintiff, and indeed the only evidence before the Court reflects that they played no role in determining whether Plaintiff was entitled to any such bonus. Davis Deposition, pp. 118, 158; Hamilton Deposition, p. 61. See Dumas, 463 S.E.2d at 645.

Plaintiff's only argument for maintaining Hamilton and Davis as Defendants under her wage payment claims is that, because a state court judge already denied a motion to dismiss with respect to this issue prior to this case being removed to federal court, it is the "law of the case". This argument is patently without merit. A ruling on a Rule 12 motion to dismiss is based solely on the pleadings, not on evidence. Duckworth v. State Admin.Bd.of Election Laws, 332 F.3d 769, 772-773 (4th Cir. 2003); Whiting v. Maiolini, 921 F.2d 5, 6 (1st Cir. 1990) ["A Rule 12(b)(6) motion is decided solely on the pleadings while a Rule 56 motion may rely on additional outside evidence."]. By contrast, on a Rule 56 motion for summary judgment, the Court reviews evidence submitted by the parties to determine whether a genuine issue of fact exists with respect to the claims being asserted. Whiting, 921 F.2d at 6; Nesbit v. Gears Unlimited, Inc., 347 F.3d 72, 77 (3rd Cir. 2003).



Hence, a denial of a motion to dismiss on an issue does not preclude the granting of summary judgment on that same issue, as these motions are evaluated under different standards. Id. See also, Lindsey v. Daytona-Hudson Corp., 592 F.2d 1118, 1121 (10th Cir. 1979) ["Until the final decree the court always retains jurisdiction to modify or rescind a prior interlocutory order."]; Nobel Ins. Co. v. City of New York, No. 00-1328, 2006 WL 2848121 at *4 (S.D.N.Y. Sept. 29, 2006) ["Although the arguing of a motion for summary judgment on the same legal issue which has already been denied on a motion to dismiss for failure to state a claim potentially may be barred under the 'law of the case' doctrine, 'where a party has argued an issue during one motion before a given judge, the doctrine does not necessarily preclude a different judge from considering the same argument proffered during a subsequent motion [for summary judgment]] (quoting Dawes v. Leonardo, 885 F.Supp. 375, 376-377 (N.D.N.Y. 1995)); S.C. v. Deptford Tp. Bd.of Educ., No. 01-5127, 2006 WL 1784591 at *4 (D.N.J. June 23, 2006) ["Although law of the case principles direct the court's discretion, [the Defendant] points out that the doctrine is not a restriction on its power, nor does it preclude granting summary judgment just because a different judge denied a prior motion to dismiss using a more liberal standard."]; cf. Moore v. Busby, 92 Fed.Appx. 699 at **2 (10th Cir. March 3, 2004).

Since the evidence that has now been laid before the Court fails to present a genuine issue of fact as to whether Hamilton and Davis knowingly permitted the Defendant ECCHC to violate South Carolina's Wage Payment Act, they are entitled to dismissal as party Defendants under this claim. Dumas, 463 S.E.2d at 645.

**Breach of Contract Accompanied by a Fraudulent Act**.  In her third cause of action, Plaintiff asserts that the Defendants are guilty of breach of contract accompanied by a



fraudulent act because they have "fraudulently" asserted that certain procedures performed by the Plaintiff are excludable from calculations of her productivity bonuses, and that they have therefore "willfully and fraudulently breached the expressed terms of the employment agreement....". Supplemental Complaint, at ¶ 26. To maintain this cause of action, Plaintiff must prove 1) a breach of contract; 2) fraudulent intent relating to the breaching of the contract and not merely to its making, and 3) a fraudulent act accompanying the breach. RoTec Services, Inc. v. Encompass Services, Inc., 597 S.E.2d 881, 883 (S.C.Ct.App. 2004); Conner v. City of Forest Acres, 560 S.E.2d 606, 612 (S.C. 2002).

       Defendants first argue that since Plaintiff has not shown that she is entitled to any productivity bonus, her claim for breach of contract accompanied by a fraudulent act likewise fails. However, the undersigned has already found a genuine issue of fact exists with respect to Plaintiff's Wage Act claim sufficient to avoid summary judgment, and the Defendants are therefore not entitled to summary judgment on this ground.

       Defendants further argue that this claim should be dismissed because Plaintiff has not produced any evidence of fraudulent intent or a fraudulent act. However, considered in the light most favorable to the Plaintiff, an inference could be derived from the evidence that the corporate Defendant failed to maintain a good faith accounting of her productivity and has used constantly changing and revised figures with respect to her productivity in an effort to deny her a productivity bonus, all of which would give rise to an issue of fact for the finder of fact with respect to whether there was any fraudulent intent in such activity. Connor, 560 S.E.2d at 612; see Muhammad v. Klotz, 36 F.Supp.2d 240, 243 (E.D.Pa. 1999) ["Thus, at the summary judgment stage the only inquiry is the threshold one of determining whether there is a need for a trial, that is, 'whether the



evidence presents a sufficient disagreement to require submission to [the jury] or whether it is so one-sided that one party must prevail as a matter of law'"], citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-252 (1986) [Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are functions for the trier of fact]; Pittman, 87 F.3d at 118 [at summary judgment, the facts and evidence are considered in the light most favorable to the non-moving party]. Therefore, the corporate Defendant is not entitled to summary judgment on this claim.

However, the undersigned again finds that Hamilton and Davis, individually, are not personally liable on this claim, and are therefore entitled to dismissal as party Defendants. Plaintiff's employment contract was with ECCHC, not with either one of these individual Defendants. While Hamilton was the one who initially employed the Plaintiff, there is no dispute that he had the authority, as the corporate Defendant's Chief Executive Officer, to hire her, and "where an agent enters into a contract for a known principal, while acting within his authority as such agent, he is not personally liable on the resultant contract. The liability, if any, for a breach of such contract is that of the principal alone." Skinner & Ruddock, Inc. v. London Guarantee & Acc. Co., 124 S.E.2d 178, 180 (S.C. 1962), citing Green v. Industrial Life & Health Ins. Co., 18 S.E.2d 873 (1942). Hamilton is not therefore personally liable for any breach of Plaintiff's employment contract. See Hirsch v. Columbia University, 293 F.Supp.2d 372, 378-379 (S.D.N.Y. 2003) [rejecting plaintiff's breach of contract claim that the Dean of the Medical School intended to bind himself personally by including personal commitments in plaintiff's employment letter, where the letter was on University letterhead and signed by the Dean over his official title]; Mcgee v. F.S. Royster Guano Co., 39 F.R.D. 578, 580 (D.S.C. 1966) ["Where an agent enters into a contract for



28

a known principal, while acting within his authority as such agent, he is not personally liable on the resultant contract.  The liability, if any, for a breach of such contract is that of the principal alone"]; *cf.* <u>McKagen v. Windham</u>, 38 S.E. 2, 4 (S.C. 1901) (government employee) [in the public employment context, to show that a public agent intended to bind themself personally, there must be a showing of an unqualified intention by the parties to bind the public agent].  As for the Defendant Davis, there is no evidence that she played any role in the formulation or execution of Plaintiff's employment contract with the corporate Defendant whatsoever.  Therefore, Davis and Hamilton are entitled to dismissal as party Defendants under Plaintiff's breach of contract accompanied by a fraudulent act claim.

      **Retaliation Claims**.  Plaintiff's second, fourth and fifth causes of action all allege that she was wrongfully discharged out of retaliation in violation of various state law theories of liability.  Specifically, Plaintiff claims that her discharge was retaliatory in violation of the South Carolina Wage Payment Act (second cause of action); was as a result of her exercising her political and civil rights in violation of South Carolina Code Ann. § 16-17-560 (fourth cause of action); and because she refused to "aid and abet the unlicensed practice of medicine and for refusing to aid and abet possible insurance fraud" (fifth cause of action).

      Defendants assert that all three of these causes of action are based on the public policy tort first recognized by the South Carolina Supreme Court in <u>Ludwick v. This Minute of Carolina, Inc.</u>, 337 S.E.2d 213 (S.C. 1985).  That case held that a cause of action in tort for wrongful discharge arises out of a retaliatory discharge of an at-will employee who has refused to violate a clear mandate of public policy (in <u>Ludwick</u>, the plaintiff had a wrongful discharge claim where the employer required the employee to violate the law was a condition of retaining employment).



Ludwick, 337 S.E.2d at 216. However, Defendants argue that Ludwick only provides for this state law tort in the case of at-will employees, and that since Plaintiff was not an at-will employee, her retaliatory discharge claims necessarily fail. Ludwick, 337 S.E.2d at 223. The South Carolina Supreme Court has noted only one exception to this rule, finding that where the employee had an employment contract providing for a 30 day right to notice of termination, the wrongful discharge tort would still apply because such a contract merely provided for a notice of termination, and did not represent a contract providing an alternative remedy for a wrongful discharge. See Stiles v. American General Life Ins. Co., 516 S.E.2d 449 (S.C. 1999). See also Stiles v. American General Life Ins. Co., 994 F.Supp. 712 (D.S.C. 1998).

   After careful review and consideration of Plaintiff's wrongful discharge claims, and in light of the relevant caselaw, the undersigned finds and concludes that all of these claims are subject to dismissal, except for Plaintiff's second cause of action as discussed below.

   First, even assuming that Plaintiff's wrongful discharge claims can be brought by a contract employee, such as the Plaintiff, no caselaw or cogent argument has been presented to support the maintenance of these claims against the individual Defendants Davis and Hamilton. Plaintiff's employment contract was with the Defendant ECCHC, not with either of these two natural Defendants, and her contract was not renewed by the Defendant ECCHC, not by either one of these two natural Defendants. As such, her wrongful discharge claims are against the corporate Defendant, and Davis and Hamilton are entitled to dismissal as party Defendants under these claims. See Sides v. Duke University, 328 S.E.2d 818, 827 (N.C.Ct.App. 1985) [holding that state law wrongful discharge claim was properly dismissed as to the natural defendants since the plaintiff's



employment contract was with Duke University, not the natural defendants];[8] <u>Ijames v. Murdock</u>, 2003 WL 1533448, at *6 (M.D.N.C. 2003) ["An action for wrongful discharge will lie against only an employer and not against an individual employee"]; <u>Cox v. Indian Head Industries, Inc.</u>, 187 F.R.D. 531, 536 (W.D.N.C. 1999) ["North Carolina does not recognize a claim against a supervisor in an individual capacity for wrongful discharge in violation of public policy"]; <u>Myers v. Town of Landis</u>, 957 F.Supp. 762 (M.D.N.C. 1996) [action for wrongful discharge will lie only against the employer, not against individuals]; <u>Lorbacher v. Housing Authority of City of Raleigh</u>, 493 S.E.2d 74, 79 (N.C. 1997).

As for the corporate Defendant, this Defendant correctly notes that Plaintiff has presented no evidence whatsoever to show that her discharge was in retaliation for any of the conduct cited in her fourth and fifth causes of action. In her fourth cause of action, Plaintiff alleges a violation of S.C.Code Ann. § 16-17-560, which makes it unlawful to discharge a citizen from employment "because of political opinions or the exercise of political rights and privileges". <u>See Culler v. Blue Ridge Elec. Cooperative, Inc.</u>, 422 S.E.2d 91, 93 (S.C. 1992). Plaintiff alleges that her contract "was terminated in retaliation because she exercised her statutory right to free political expression", referencing her allowing her name to be used in the advertisement that appeared in *The State* newspaper relating to the pending tort reform legislation in the South Carolina General Assembly. However, there is no evidence of any such retaliatory animus in the record of this case. The evidence reflects that Hamilton was concerned about *all* of the OB/GYN physicians signing on

---

[8]While there is apparently no South Carolina precedent on this particular issue, Defendants correctly note that, in creating a state cause of action for wrongful discharge in <u>Ludwick</u>, the South Carolina Supreme Court drew on the law of other jurisdictions, in particular the State of North Carolina, even citing the <u>Side</u>'s decision. <u>Ludwick</u>, 337 S.E.2d at 215 (citing, <u>inter alia</u>, <u>Sides v. Duke University</u>).



to this letter, and that all of these physicians received a written warning regarding this conduct. Hamilton Deposition, p. 88; Thomas Affidavit, Exhibits 8 - 11; Hamilton Affidavit, ¶ 8; Davis Deposition, pp. 88-91. Plaintiff was not treated any differently with respect to this issue than the other OB/GYN physicians, and there is no evidence that Plaintiff was singled out for termination of her contract solely because she participated in this conduct, separate and apart from the other physicians. Further, even if the evidence, considered in the light most favorable to the Plaintiff, could be construed as showing that Plaintiff may have been retaliated against for having *filed a grievance* about having received this written warning, if so then that evidence would be showing that Plaintiff was retaliated against because she pursued a grievance against the Defendant, not because she exercised any political rights she may have had by signing the tort reform letter. Plaintiff has failed to show she was discharged in violation of Section 16-17-560, and her fourth cause of action should therefore be dismissed.

Plaintiff's fifth cause of action fails for the same reason. In her fifth cause of action, Plaintiff alleges that she was wrongfully discharged as retaliation for having participated in and arranging the after-hours call schedule with Dr. Carzoli's office when he was going to be out of town. As was the case with Plaintiff's fourth cause of action, Plaintiff grieved the written warning she received as a result of this incident, and while Plaintiff may or may not believe that one reason her contract was not renewed was because of her grievance activity and resulting claims she was making against the Defendants, if so then that retaliation was due to her having filed this grievance and her activity related thereto, not because of the earlier conduct for which she had received the written warning. Plaintiff's Deposition, pp. 75-79, 196; Davis Deposition, pp. 106-108; Thomas Affidavit, Exhibits 12 - 14. As noted during the discussion of Plaintiff's Title VII claims, a

32



retaliation claim is a claim separate and apart from other claims, and to the extent any evidence of retaliation is before this Court, it is evidence that the Defendant may have discharged the Plaintiff for filing her grievances and making other claims, not for her earlier conduct of arranging an after-hours call schedule.  See Thomas Affidavit, Exhibits 23 - 27.  There is no evidence that the Plaintiff's discharge was due to her having arranged the after-hours call schedule with Dr. Carzoli's office, and this claim should therefore be dismissed.

Finally, however, Plaintiff's second cause of action under the Wage Payment Act is not based on any earlier conduct for which she was reprimanded, but arose out of the series of memoranda and documents Plaintiff submitted to the Defendants following the commencement of her grievance process. The evidence shows that on February 23, 2004, Plaintiff made a demand for monetary compensation under the South Carolina Wage Payment Act. That same day Plaintiff's grievances and disputes with the Defendant were discussed at an ECCHC Board meeting, with the minutes reflecting that Plaintiff was described as a "disaffected provider" who did not think she was being treated fairly, and noting that her contract ended July 5 and probably would not be renewed. Thomas Affidavit, Exhibits 21 and 23. The undersigned cannot find as a matter of law based on this evidence that Plaintiff's failure to have her contract renewed was not based, at least in part, on her wage demand based on this evidence, and in particular the proximity in time between these two events and her eventual termination. See Muhammad, 36 F.Supp.2d at 243 ["Thus, at the summary judgment stage the only inquiry is the threshold one of determining whether there is a need for a trial, that is, 'whether the evidence presents a sufficient disagreement to require submission to [the jury] or whether it is so one-sided that one party must prevail as a matter of law'"], citing Anderson, 477 U.S. at 250-252 [Credibility determinations, the weighing of evidence, and the drawing of



legitimate inferences from the facts are functions for the trier of fact]; <u>Pittman</u>, 87 F.3d at 118 [at summary judgment, the facts and evidence are considered in the light most favorable to the non-moving party]. Therefore, this claim is not subject to summary judgment if it otherwise falls within the parameters set by the South Carolina Supreme Court for maintenance of such a claim. *Cf.* <u>Keiger v. Citgo Coastal Petroleum, Inc.</u>, 482 S.E.2d 792 (S.C.Ct.App. 1997) [Reversing dismissal of public policy wrongful discharge claim that alleged employer's retaliatory discharge of an employee who threatened to invoke her rights under the Payment of Wages Act in violation of public policy]; <u>Evans v. Taylor Made Sandwich Company</u>, 522 S.E.2d 350, 353-354 (S.C.Ct.App. 1999). The undersigned finds that Plaintiff's claim does fit within these parameters under the narrow and specific facts of this case, and that this claim is not therefore subject to summary judgment.

Specifically, while Plaintiff did have a contract of employment with the corporate Defendant, and was not therefore an at-will employee, the circumstances of her discharge fall within the exception set forth by the state Supreme Court in <u>Stiles</u>. As was the case in <u>Stiles</u>, the Plaintiff here received notice that she would be terminated at the end of her contract term,[9] and that her contract would not be renewed or continued. She was not discharged during the term of her contract. <u>Stiles</u> held that in such a situation, the employee "does not have an alternative remedy for wrongful discharge, but merely is entitled to notice of termination...." and that a finding that such an employee "is not entitled to bring an action for retaliatory discharge in violation of public policy violates the spirit of the public policy exception." <u>Stiles</u>, 516 S.E.2d at 451.

> In this case, the employee does not have an alternate remedy based on an allegation of wrongful discharge. The employee with a notice provision is in the same position as an at-will employee with the only difference being that the employer is required

---

[9]In <u>Stiles</u>, it was at the end of the Plaintiff's 30-day notice requirement.



> to give the employee notice prior to terminating employment. In considering the purpose behind the public policy exception, the "mere encouragement that one violate the law is unsavory: the threat of retaliation for refusing to do so is intolerable and impermissible." Ludwick, supra.

Id.

As noted by the Chief Justice in her concurring opinion, "[t]he notice provision in such contracts provides no protection from the discharge itself, but simply makes an employer wait longer before the termination of an employee is complete," but nevertheless leaves the employee with no contractual remedy. Stiles, 516 S.E.2d at 452-453. See also Temple v. Medical University of South Carolina, No. 02-2104, 2004 WL 3317660, at * 11 (D.S.C. Feb. 6, 2004), where the Court held that an employee whose employment contract was not renewed had no public policy wrongful discharge claim because, in part, she had "presented no evidence that the non-renewal of her contract was in any manner or form a violation of a clear mandate of the public policy of this state." Here, of course, the undersigned has found that a genuine issue of fact exists with respect to this issue. See discussion, supra; Keiger, 482 S.E.2d 792; Evans, 522 S.E.2d at 353-354.

Therefore, the corporate Defendant's motion for summary judgment with respect to Plaintiff's second cause of action should be denied.

## Conclusion

Based on the foregoing, it is recommended that the corporate Defendant's motion for summary judgment with respect to Plaintiff Title VII hostile work environment claim (sixth cause of action) as well as with respect to Plaintiff's Title VI claims (eighth and ninth causes of action) be **granted**, and that those claims be **dismissed**. It is further recommended that this Defendant's motion for summary judgment with respect to Plaintiff's Title VII retaliation claim (seventh cause of action) be **denied**.

35



With respect to Plaintiff's state law causes of action, it is recommended that the Defendants Hamilton and Davis be **granted** summary judgment on the claims made against them, and that they be **dismissed** as party Defendants. It is further recommended that Plaintiff's wrongful discharge claims (fourth and fifth causes of action) be **dismissed** for the reasons stated.

Finally, it is recommended that the corporate Defendant's motion for summary judgment with respect to Plaintiff's claims under the South Carolina Wage Payment Act (first and second causes of action), as well as for breach of contract accompanied by a fraudulent act (third cause of action), be **denied**.

_____
Bristow Marchant
United States Magistrate Judge

Columbia, South Carolina

July 11, 2007

36

